# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIELLE SALVATORE, | ) | |
| individually and on behalf of all others | ) | |
| similarly situated, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| PENNSYLVANIA HIGHER | ) | Judge: _____ |
| EDUCATION ASSISTANCE | ) | |
| AGENCY, | ) | |
| a/k/a PHEAA, | ) | |
| a/k/a FEDLOAN SERVICING, | ) | *JURY TRIAL DEMANDED* |
| | ) | *EQUITABLE RELIEF SOUGHT* |
| *Defendant.* | ) | |

## COMPLAINT--CLASS ACTION

Plaintiff, Danielle Salvatore ("Plaintiff"), by her undersigned attorney, on her own behalf and on behalf of all others similarly situated, upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, brings this action against Defendant Pennsylvania Higher Education Assistance Agency ("PHEAA") also known as PHEAA and also known as FedLoan Servicing ("FedLoan") (collectively, "Defendant") and alleges as follows:

## NATURE OF THE ACTION

Upon entering repayment and at any time during the repayment process, federal student loan borrowers have multiple repayment options. Many student loan

borrowers, rather than choosing the "standard" 10-year repayment option, which can range from hundreds to *thousands* of dollars per month, turn to "income-driven" student loan repayment plans. Income-driven repayment plans allow a student loan borrower to pay only a percentage of his or her "discretionary income" towards student loan debt each month, which is the only monthly payment many student loan borrowers can afford.

Prior to December 2015, there were four income-driven repayment plans available to financially-burdened student loan borrowers: (1) Income-Contingent Repayment ("ICR") – 20% of discretionary income for 25 years, remaining balance is forgiven after 25 years of qualifying payments; (2) Income-Based Repayment ("IBR") – 15% of discretionary income for 25 years, remaining balance is forgiven after 25 years of qualifying payments; (3) IBR for New Borrowers – 10% of discretionary income for "new borrowers" for 20 years, remaining balance is forgiven after 20 years of qualifying payments; and (4) Pay-As-You-Earn ("PAYE") – 10% of discretionary income for 20 or 25 years, but only applies to a "new borrower" as of October 1, 2007, who also received a disbursement of a Direct Loan on or after October 1, 2011.

Importantly, each of these plans allows student loan borrowers to only consider his or her income when calculating the monthly payment amount for each repayment plan, by filing his or her federal income taxes as either "single" or "married filing separately," and each of these plans has a "cap" or maximum amount that the borrower would have to pay.

However, beginning in December 2015, a fifth income-driven student loan repayment option was introduced: Revised Pay-As-You-Earn ("REPAYE"). At first blush, REPAYE seems to offer student loan borrowers significant cost savings over ICR and IBR, as it calculates monthly payments at 10% of your discretionary income, rather than the 15% required under ICR and IBR. However, REPAYE has several significant and detrimental differences when compared to ICR, IBR, new IBR, and PAYE. These differences have the potential to make student loan servicers and the student loan holders – which is often the federal government or the student loan servicer – significant amounts of money both at the student loan borrower's (voluntary or, as alleged further below, involuntary) enrollment in REPAYE and at the end of a student loan borrower's repayment schedule, when his or her income is presumably the highest.[1]

First, and perhaps most importantly for the student loan borrower and the student loan holder, REPAYE does not allow a married student loan borrower to consider only his or her income in the income-driven repayment plan's payment amount calculation (unless the borrower is separated from his or her spouse or unable to determine his or her spouse's income). Rather, once a student loan borrower is married, his or her "discretionary income" *must include* his or her spouse's income –

---

[1] The student loan holder is the entity that originated the student loan, while the student loan servicer is the entity that is handling the student loan's repayment. Depending on the loan type, these two entities could be the same.

no matter how the borrower files his or her federal income taxes. This could, and often does, result in a significantly higher monthly payment amount, and, therefore, more money paid to the student loan holder under REPAYE as opposed to ICR, IBR, new IBR, and PAYE. Second, and equally important to the student loan borrower, there is no "cap" or maximum amount that the borrower could have to pay under REPAYE.

As such, this could result in significantly more money paid to the student loan holder under REPAYE as opposed to ICR, IBR, new IBR, and PAYE, which all have a cap on the maximum amount the borrower could possibly pay as part of his or her repayment of student loans. Consequently, these two "new" provisions of REPAYE, which do not apply to ICR, IBR, new IBR, and PAYE, have the potential to make REPAYE the most costly income-driven repayment plan to student loan borrowers over the life of the loan – which also means that REPAYE has the potential to make student loan holders the most money over the life of the loan.

Additionally, REPAYE has two other important provisions that are not only more costly to student loan borrowers, but also provide student loan servicers, like Defendant, significant financial incentives to switch borrowers from other plans to REPAYE. First, when a student loan borrower switches from IBR to REPAYE, he or she must first enter the standard 10-year repayment plan for one month – and, therefore, pay the full standard payment for that month, which, in almost all cases will be an astronomical increase from the student loan borrower's calculated IBR payment amount. The only alternative to paying the full standard payment is to seek a

forbearance for that transitional period, instead. However, the student loan borrower is required to pay a fee for the forbearance and the student loan borrower's income-driven repayment schedule is postponed during that month. Additionally, if the student loan servicer does not appropriately process the student loan borrower's switch to REPAYE, the student loan borrower must continue to make full payments or continue in forbearance for more than one month: *i.e.*, as long as it takes the student loan servicer to finalize the switch. Second, when a borrower switches from IBR to REPAYE, any outstanding interest owed will be capitalized (*i.e.*, added to the loan's principal balance).

While both of these provisions enrich student loan holders through fees, capitalized interest, and potentially higher payment amounts, they also provide student loan servicers, like Defendant, huge incentives to switch student loan borrowers to REPAYE, as well. Although it may seem logical that student loan servicers would not want their borrowers to be in forbearance, but rather be making monthly payments, that is not always the case. Instead, under their contract with the federal government, student loan servicers have a financial incentive to have only some of their borrowers in repayment, but others in forbearance. Using Defendant's contract with the federal government, Defendant makes $2.11 per month for each student loan borrower who is in their grace period or a current repayment plan – but only up to 3 million student loan borrowers. After Defendant has 3 million student loan borrowers in grace or repayment status, they then only make $1.90 per month for each additional student loan borrower in grace or repayment. However, for up to 1.6 million borrowers in forbearance or

deferment, Defendant makes $2.07 per month – or $0.17 per month more than if that borrower had been in repayment. Therefore, once Defendant has 3 million borrowers in grace or repayment status, Defendant makes more money on the next 1.6 million people by having them in forbearance or deferment, rather than in repayment. While an extra $0.17 may seem trivial, when it is applied to 1.6 million student loan borrowers, the monthly and yearly benefit to Defendant is staggering - $272,000.00 extra per month or $3,264,000.00 extra per year. As such, Defendant has a financial incentive to switch student loan borrowers to REPAYE in order to place them in forbearance while Defendant processes the change.

Additionally, student loan servicers can have a financial incentive in having a student loan borrower's outstanding interest capitalized when he or she switches to REPAYE. When outstanding interest is capitalized, it is added to the student loan borrower's principal amount. This higher principal amount means a higher dollar amount that accrues interest, which, in turn, leads to a higher amount of interest accrued. According to Defendant's Quarterly Financial Report September 30, 2016 and 2015, for certain loans, Defendant "earn[s] interest subsidies and special allowance payments," which they describe as the "[Education Department] pays the interest subsidy payments based on the amount of interest accruing on the unpaid balance, prior to the commencement of repayment or during the deferment period."

As such, due to the significant differences between REPAYE and ICR, IBR, new IBR and PAYE – differences that have the potential to make student loan holders and

servicers significant amounts of money both at the beginning of REPAYE and at the end of a borrower's repayment schedule when his or her income is presumably the highest – student loan servicers, including Defendant, have a significant motivation to switch borrowers from ICR, IBR, new IBR, and PAYE to REPAYE. Therefore, on information and belief, and as further detailed below, Defendant has engaged in unfair or deceptive acts or practices in order to switch borrowers from ICR, IBR, new IBR, and PAYE to REPAYE, so as to place and keep borrowers in forbearance while the switch is processed and otherwise maximize profits at the student loan borrower's expense.

First, Defendant does not fully describe, or intentionally incorrectly describe REPAYE to potential borrowers, in that Defendant fails to: (1) inform the borrower of the extra fees, interest, and payments that can occur when switching to REPAYE, (2) inform the borrower of the delay that occurs when switching to REPAYE, (3) inform the borrower that REPAYE, unlike the other repayment plans, does not have a payment "cap," and (4) inform the borrower that REPAYE, unlike the other repayment plans, *must include* a spouse's income when determining "discretionary income," regardless of how the borrower's taxes are filed.[2]

---

[2] REPAYE, like the other IDR plans, allows for a spouse's income to be excluded from the "discretionary income" determination if the borrower is separated from his or her spouse or unable to determine his or her spouse's income. In all but the most extreme

Additionally, and perhaps most appalling, when a student loan borrower files his or her annual application and demands to remain on his or her current plan by checking the appropriate checkbox, Defendant has altered student loan borrowers' income-driven applications to also check one (1) other checkbox that, according to Defendant, allows Defendant to enroll student loan borrowers in the REPAYE plan without the student loan borrowers knowledge or consent.

Furthermore, once a student loan borrower contacts Defendant to contest the improper change to the REPAYE payment plan, Defendant fails and refuses to change the student loan borrower back to his or her previous income driven repayment plan at all, much less without any penalty, delay, or extra cost to the student loan borrower.

Finally, and as described above, Defendant is utilizing a REPAYE processing procedure that takes many, many months – rather than the one month contemplated by the Higher Education Act. As such, Defendant impermissibly forces student loan borrowers to: (1) continuously either pay the potentially astronomical standard payment amount while the REPAYE option is processed or (2) continuously apply for a month-by-month forbearance, which requires payment of a fee by the student loan borrower each time, capitalization of interest each month, and extension of the student loan borrower's repayment term for each month forbeared – all of which enrich the student

---

cases, this means that a student loan borrower's spouse's income must be included in REPAYE.

loan holders and servicers, while costing the student loan borrowers significant amounts of time and money.

Importantly, this lawsuit has significance beyond this action because of the Public Student Loan Forgiveness ("PSLF") program. The PSLF program allows a borrower to have the remaining balance of his or her student loans forgiven after he or she makes 120 on-time, qualifying payments while working for a qualifying public interest employer, such as the government or a nonprofit organization. As the PSLF program was adopted in 2007, student loan borrowers will first be eligible to receive PSLF forgiveness in October of 2017. Qualifying payments include payments made under ICR, IBR, PAYE and REPAYE, as well as the standard repayment plan or any other payment plan with monthly payments that equal or exceed the standard repayment amount. However, and very importantly, a student loan borrower must still be working for the qualifying employer <u>and making on-time payments to the student loan servicer</u> both at the time that the student loan borrower applies for PSLF forgiveness <u>and at the time that the student loan servicer grants the forgiveness</u> – or else the borrower does not qualify for PSLF.

Therefore, this lawsuit is extremely important for the future of the PSLF program because the Defendant is the federal government's designated, exclusive student loan servicer for the PSLF program. As such, when a borrower files a PSLF Employment Certification form, providing information to their current student loan servicer that they would like to "certify" their prior payments under the PSLF program,

as a required condition of that certification, their loans are automatically transferred to Defendant for servicing. Further, in October of 2017, when student loan borrowers who had not previously filed a PSLF Employment Certification form request PSLF forgiveness, their loans must first be transferred to Defendant in order for their PSLF forgiveness to be approved. Consequently, if Defendant employs a multiple-month processing procedure for PSLF, similar to that which they are employing for REPAYE, then Defendant will likely cause PSLF student loan borrowers to pay months and months of extra student loan payments while Defendant is "processing" their request – payments that are well above and beyond the 120 payments required by law.

## THE PARTIES

1.      Plaintiff Danielle Salvatore is an individual citizen of the State of Texas. Ms. Salvatore resides in San Antonio, Texas. Ms. Salvatore has been on active military duty since October 2012.

2.      Defendant Pennsylvania Higher Education Assistance Agency, also known as PHEAA, also known as FedLoan Servicing, is one of the nation's largest student loan servicers. Defendant is organized under the laws of Pennsylvania, 24 P.S. § 5101 and is headquartered and located in Harrisburg, Pennsylvania.

3.      Defendant is a citizen of the Commonwealth of Pennsylvania.

4.      Defendant may be served at 1200 North 7th Street, Harrisburg, Pennsylvania 17102.

## JURISDICTION AND VENUE

5.      This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331.

6.      Further, this Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. 1332(d)(2) based on minimal diversity of citizenship between Plaintiff and Defendant and an amount in controversy exceeding $5,000,000.

7.      This Court has supplemental jurisdiction over pendent state law claims pursuant to 28 U.S.C. §1367(a).

8.      This Court has personal jurisdiction over the Defendant because Defendant regularly and systematically conducts business in this District.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant has and continues to operate its student loan servicing enterprise in this District.

## FACTUAL ALLEGATIONS

### *Student Loan Holder's Motivation to Improperly Switch Borrowers to REPAYE*

10.      As of February 21, 2017, student loan borrowers in the United States owed over $1.4 *trillion* dollars in student loan debt (principal plus capitalized interest) – and this amount increases at a rate of $2,853.88 per second.[3]

---

[3] Finaid.org debt calculator.
(http://www.finaid.org/loans/studentloandebtclock.phtml)

11.    For borrowers already struggling to pay ever-increasing childcare costs or save enough to purchase a first home, attempting to pay crushing student loan debt can seem impossible.

12.    This is especially true when the "standard" repayment option, which spreads the total principal amount of the loan plus daily interest over ten (10) years, can range from hundreds to *thousands* of dollars per month.

13.    As such, many student loan borrowers turn to "income-driven" repayment plans, which allow the borrower to pay only a percentage of his or her "discretionary income" as payments, rather than paying the full amount due under the "standard" repayment plan.

14.    However, these "income-driven" repayment plans are generally scheduled for payoff or forgiveness after twenty (20) or twenty-five (25) years.

15.    "Discretionary income" is the difference between the student loan borrower's adjusted gross income ("AGI") and 150 percent of the poverty guideline for the student loan borrower's family size.

16.    Before December of 2015, there were four income-driven repayment plans established under the Higher Education Act of 1965 that allowed financially-burdened student loan borrowers to repay his or her federal student loans at a reduced amount, but over a longer duration.

17.    These plans include:

(1) <u>Income-Contingent Repayment ("ICR")</u> – 20% of discretionary income for 25 years, remaining balance is forgiven after 25 years of qualifying payments;

(2) <u>Income-Based Repayment ("IRB")</u> – 15% of discretionary income for 25 years, remaining balance is forgiven after 25 years of qualifying payments;

(3) <u>IBR for New Borrowers</u> – 10% of discretionary income for "new borrowers" for 20 years, remaining balance is forgiven after 20 years of qualifying payments;

(4) <u>Pay-As-You-Earn ("PAYE")</u> – 10% of discretionary income, but only applies to a "new borrower" as of October 1, 2007, who also received a disbursement of a Direct Loan on or after October 1, 2011.

18.     Each of these plans allows student loan borrowers to only consider his or her income when calculating the applicable payment amount for each repayment plan.

19.     This is accomplished by the borrower filing his or her taxes as either "single" or "married filing separately."

20.     As such, under ICR, IBR, IBR for New Borrowers, and PAYE, there is a clear course of action that a student loan borrower can follow to ensure that the student loan borrower's income – and, importantly, *only* the student loan borrower's income – is considered in determining the income-driven payment amount.

21.     Stated differently, ICR, IBR, IBR for New Borrowers, and PAYE repayment plans allow a student loan borrower to exclude his or her spouse's income in the payment amount calculation by simply filing his or her federal taxes as "single" or "married filing separately."

22.     Additionally, each of these plans has a "cap," or maximum total payment amount that the student loan borrower would have to pay.

23.    For IBR and PAYE, no matter the borrower's income, he or she would never pay more than the standard repayment plan amount.

24.    For ICR, the borrower would never pay more than he or she would pay on a repayment plan with a fixed payment over the course of 12 years, adjusted according to his or her income.

25.    Beginning in December of 2015, the Higher Education Act authorized a fifth income-driven student loan repayment option for federal loans: Revised Pay-As-You-Earn or "REPAYE."

26.    REPAYE allows any borrower to pay only 10% of his or her "discretionary income," for 20 or 25 years, depending on whether there were Direct Loans taken out for graduate or professional study, and the remaining balance is forgiven.

27.    So, at first blush, REPAYE seems to offer student loan borrowers significant cost savings over ICR and IBR.

28.    However, REPAYE has several significant differences when compared to ICR, IBR, new IBR, and PAYE.

29.    These differences, especially if capitalized on by student loan servicers, have the potential to make student loan holders significant amounts of money both at the student loan borrower's (voluntary or involuntary) enrollment in REPAYE and at the end of a student loan borrower's repayment schedule when his or her income is presumably the highest.

30.    First, and perhaps most importantly, REPAYE does not allow student loan borrowers to consider only his or her income in the income-driven repayment plan's payment amount calculation (unless the borrower is separated from his or her spouse or unable to determine his or her spouse's income).

31.    Rather, once a student loan borrower is married, his or her "discretionary income" *must include* his or her spouse's income – no matter how the borrower files his or her income taxes.

32.    This could, and often does, result in a significantly higher monthly payment amount, and, therefore, more money paid to the student loan holder under REPAYE as opposed to ICR, IBR, new IBR, and PAYE, which all allow a borrower to consider only his or her income in calculating his or her repayment amount.

33.    Secondly, and perhaps equally as important, there is no "cap" or maximum amount that the borrower could have to pay under REPAYE.

34.    This could result in significantly more paid to the student loan holder under REPAYE as opposed to ICR, IBR, new IBR, and PAYE, which all have a cap on the maximum amount the borrower could possibly pay.

35.    As such, borrowers under the REPAYE plan could, and upon information and belief, already have, found themselves paying significantly more per month than they would have paid under the standard repayment plan, ICR, IBR, new IBR or PAYE.

36.     Additionally, the Higher Education Act has two other important provisions that provide additional amounts to student loan holders when a borrower switches his or her repayment plan to REPAYE.

37.     First, when a borrower switches from IBR to REPAYE, he or she must first enter the standard 10-year repayment plan for one month – and, therefore, pay the full standard payment for that month, which, in many cases will be an exorbitant amount.

38.     The only alternative to paying the full standard payment is to seek forbearance for that one-month transitional period, instead.

39.     However, the borrower will have to pay the student loan holder a fee for that forbearance and the student loan borrower's repayment schedule is placed on hold and pushed back until his or her first REPAYE payment.

40.     Secondly, when a borrower switches from IBR to REPAYE, any outstanding interest owed will be capitalized (i.e., added to the loan's principal balance).

41.     Both of these provisions provide additional, significant amounts (higher payment amount, fees, capitalized interest) to the student loan holder, which the student loan holder would not have gotten without switching a borrower to the REPAYE option.

42.     Due to the significant differences between REPAYE and ICR, IBR, new IBR or PAYE, student loan holders have a significant motivation to switch borrowers from ICR, IBR, new IBR, and PAYE to REPAYE – whether the student loan borrower

wants to switch or not – in order to maximize their own profits at the student loan borrower's expense.

### Student Loan Servicer's Motivation to Improperly Switch Borrowers to REPAYE

43.    Student loan servicers, like Defendant, also have huge incentives to switch student loan borrowers to REPAYE.

44.    First, while it may seem logical that student loan servicers would not want their borrowers to be in forbearance, but rather be making monthly payments, that is not always the case.

45.    Instead, under their contract with the federal government, student loan servicers have a financial incentive to have <u>only some of their borrowers in repayment, but others in forbearance</u>.

46.    This is evident after viewing Defendant's contract with the federal government:

| Status | Volume Low | Volume High | Unit Price |
|---|---|---|---|
| Borrowers in In-school Status | N/A | N/A | $    1.050 |
| Borrowers in Grace or Current Repayment Status | 1 | 3,000,000 | $    2.110 |
|  | 3,000,001 | UP | $    1.900 |
| Borrowers in Deferment or Forbearance | 1 | 1,600,000 | $    2.070 |
|  | 1,600,001 | UP | $    1.730 |
| Borrowers 31-90 Days Delinquent | N/A | N/A | $    1.620 |
| Borrowers 91-150 Days Delinquent | N/A | N/A | $    1.500 |
| Borrowers 151-270 Days Delinquent | N/A | N/A | $    1.370 |
| Borrowers 270+ Days Delinquent | N/A | N/A | $    0.500 |

47.     Under Defendant's contract, Defendant makes $2.11 per month for each student loan borrower who is in grace or a current repayment plan – but only up to 3 million student loan borrowers.

48.     After Defendant has 3 million student loan borrowers in grace or repayment, they then only make $1.90 per month for each additional student loan borrower in grace or repayment.

49.     However, for up to 1.6 million borrowers in forbearance or deferment, Defendant makes $2.07 per month – or $0.17 per month more than if that borrower had been in repayment.

50.     Therefore, once Defendant has 3 million borrowers in grace or repayment status, Defendant makes more money on the next 1.6 million people by having them in forbearance or deferment, rather than in repayment. (1.6 million x $0.17 = $272,000/mo or $3,264,000/year).

51.     As such, Defendant has a financial incentive to switch student loan borrowers to REPAYE in order to place – and *keep* – them in forbearance while Defendant processes the change.

52.     Consequently, if the student loan servicer does not appropriately and timely process the student loan borrowers switch to REPAYE, the student loan borrower must continue to make full payments or continue in forbearance until the student loan servicer finalizes the switch – and the student loan servicer, for each student loan borrower over 3 million, makes an additional amount.

53.     Student loan servicers have a second financial incentive to switch student loan borrowers from IBR to REPAYE because outstanding interest is capitalized when the switch occurs.

54.     When outstanding interest is capitalized, it is added to the student loan borrower's principal amount.

55.     When interest is capitalized after an IBR, ICR, or PAYE to REPAYE switch, the student loan borrower's entire outstanding interest – from the time they started on IBR – is capitalized.

56.     As such, it is not uncommon for tens of thousands of dollars of accrued interest to be added to a student loan borrower's principal amount in one day after their IBR to REPAYE switch is processed.

57.     This higher principal amount means a higher dollar amount that accrues interest, which, in turn, leads to a high amount of interest accrued.

58.     According to Defendant's Quarterly Financial Report September 30, 2016 and 2015, for certain loans, Defendant "earn[s] interest subsidies and special allowance payments," which they describe as the "[Education Department] pays the interest subsidy payments based on the amount of interest accruing on the unpaid balance, prior to the commencement of repayment or during the deferment period." See below:

**Student Loan Holdings**

The Student Aid and Fiscal Responsibility Act ("SAFRA") terminated our authority to originate new loans under the FFEL program after June 30, 2010, and currently, all new Stafford, Parent Loan for Undergraduate Students ("PLUS") and Consolidation student loans are originated under the Direct Loan program. We purchase student loans originated under the FFEL program from banks and other lenders from time to time.

We earn interest subsidies and special allowance payments on certain FFEL program student loans within our student loan portfolio. ED makes interest subsidy payments to holders of qualifying FFEL program loans under the Higher Education Act of 1965, as amended, on subsidized Stafford loans and qualifying Consolidation loans, while the student is a qualified student, during a qualifying grace period and during periods of deferment. ED pays the interest subsidy payments based on the amount of interest accruing on the unpaid balance, prior to the commencement of repayment or during the deferment period. We record the interest subsidy payments as "Student Loan Interest Revenue, net".

59.     Therefore, as student loan servicers can be paid additional amounts for additional accruing interest, student loan servicers have a financial incentive to switch borrowers to REPAYE.

### *Defendant is Providing Deceptive, Vague, Incomplete and Inaccurate Information about REPAYE in Attempts to Convince Borrowers to Switch to REPAYE*

60.     Defendant's website provides a myriad of tools and "informational" webpages that describe the different repayment plans available to borrowers.

61.     Included in these tools and informational pages are descriptions of ICR, IBR, new IBR, PAYE and REPAYE.

62.     However, Defendant, in describing REPAYE to potential borrowers, fails to:

    a) inform the borrower of the extra fees, interest, and payments that can occur when switching to REPAYE,

    b) inform the borrower of the delay that occurs when switching to REPAYE,

    c) inform the borrower that REPAYE, unlike the other repayment plans, does not have a payment "cap," and

d) inform the borrower that REPAYE, unlike the other repayment plans, *must include* a spouse's income when determining "discretionary income," regardless of how the borrower's taxes are filed, unless a very limited exception applies.

63.    For instance, Defendant erroneously describes "discretionary income" under REPAYE in its Glossary, which describes "discretionary income" under REPAYE as:



64.    As such, Defendant equates "discretionary income" under REPAYE to discretionary income under IRB and PAYE – which is absolutely incorrect and misleading.

65.    Rather, unlike IBR and PAYE, "discretionary income" under REPAYE is __not__ "the difference between *your* adjusted gross income and 150 percent of the poverty

guideline" – in reality, it is the difference between *your and your spouse's* adjusted gross income and 150 percent of the poverty guideline.[4]

66.    Therefore, Defendant falsely placed this information ("If you are married, under certain circumstances your discretionary income may include your spouse's income") under ICR – when it should be under REPAYE, as REPAYE is the only income-driven choice that must include your spouse's income.[5]

67.    Therefore, while ICR, IBR and PAYE all treat discretionary income calculations the same and REPAYE is the "odd" plan out, Defendant did not group ICR, IBR and PAYE together and separate out REPAYE.

68.    Instead, Defendant grouped IBR, PAYE, and REPAYE together and separated out ICR – and then only placed the "spouse's income warning" under ICR.

69.    Additionally, Defendant fails to clearly describe REPAYE when describing its income-driven repayment plans in several areas, including its Repayment Plans webpage.

---

[4] REPAYE, like the other IDR plans, allows for a spouse's income to be excluded from the "discretionary income" determination if the borrower is separated from his or her spouse or unable to determine his or her spouse's income.

[5] REPAYE, like the other IDR plans, allows for a spouse's income to be excluded from the "discretionary income" determination if the borrower is separated from his or her spouse or unable to determine his or her spouse's income.

70.    Defendant's webpage describes it's numerous repayment plan options as follows:



71.    For instance, Defendant describes what a student loan borrower's payment will be under ICR, IBR and PAYE, under Payments and Term, in the following way:

# Income-Contingent Repayment (ICR)

ICR is right for you if you are worried about your monthly payments and need some flexibility based on your financial situation.

VIEW REPAYMENT ESTIMATES                                        HOW TO APPLY 

## Plan Features

- Monthly payments as low as $0 per month.
- Payment amounts based on your income, family size, and loan debt.
- Extended repayment period.
- Offers loan forgiveness after 25 years of qualifying payments.

## Payments and Term

- Reduced monthly payments are calculated using your discretionary income, family size, and total amount of eligible loan debt.
- Payments are generally adjusted based on your income using the lesser of:

  1. 20% of your discretionary income
  2. The amount you would pay under a fixed repayment plan over 12 years.

- Payments are made for up to 25 years.

### Other Important Information

- If you're married and file a joint federal income tax return, your spouse's adjusted gross income is also considered (unless you are separated or unable to obtain your spouse's income information).
- Since the information used to calculate your payment may change from year-to-year, you must recertify annually for ICR.

# Income-Based Repayment (IBR)

IBR is right for you if you have little to no income, mounds of student loan debt, or you're stressed about the affordability of your monthly payments.

VIEW REPAYMENT ESTIMATES                                        HOW TO APPLY 

## Plan Features

- Monthly payments as low as $0 per month.
- Payment amounts based on your income and family size.
- Extended repayment period.
- Offers loan forgiveness after 25 years of qualifying payments (20 years for new borrowers*).

## Payments and Term

- Reduced monthly payments are calculated using your discretionary income and family size.
- Payments are generally 15% of your discretionary income (10% for new borrowers*).
- Payments are made for up to 25 years.

### Other Important Information

- If you're married and file a joint federal income tax return, your spouse's eligible student loan debt and adjusted gross income are also considered (unless you are separated or unable to obtain your spouse's income information).
- Since the information used to calculate your payment may change from year-to-year, you must recertify annually for IBR.

*A new borrower for the IBR plan has no outstanding balance on a Direct or FFEL Program Loan as of July 1, 2014, or has no outstanding balance on a Direct or FFEL Program Loan when he or she obtains a new loan on/after July 1, 2014.



72.    However, when describing what a borrower's payment will be under REPAYE, Defendant merely states:



73.     As such, under ICR, IBR and PAYE, FedLoan is very clear about when a spouse's income is considered, stating:

ICR:            Reduced monthly payments are calculated using your discretionary income, family size, and total amount of eligible student loan debt.

IBR, PAYE:      Reduced monthly payments are calculated using your discretionary income and family size.

ICR, IBR, PAYE:  If you're married and file a joint federal income tax return, your spouse's adjusted gross income is also considered (unless you are separate or unable to obtain your spouse's income information.)

74.     However, for REPAYE, which <u>absolutely requires</u> that "discretionary income" include a spouse's income unless the borrower is separated or unable to obtain his or her spouse's income information, Defendant merely states:

REPAYE:         Reduced monthly payments are calculated using your discretionary income (with your spouse, if applicable).

REPAYE:         You must provide income documentation for yourself and your spouse regardless of whether you file your taxes jointly or separately (unless you file separately because you are separated or unable to obtain your spouse's income information).

### *When Deception Fails, Defendant Chooses to Enroll Student Loan Borrowers in REPAYE without Authorization*

75.     Upon information and belief, when Defendant is unable to coerce student loan borrowers into switching to REPAYE by failing to clearly describe and misrepresenting REPAYE and its consequences, Defendant still switches borrowers to REPAYE against their will.

76.     Defendant accomplishes this by checking or representing to borrowers that they had checked Item #2 on the borrower's Income-Driven Repayment Plan Request, which states, "(Recommended) I want my loan holder to place me on the plan with the lowest monthly payment."

77.     Once Defendant has checked or believes that a borrower has checked Item #2 on the Income-Driven Repayment Plan Request, Defendant proceeds as though it has non-revocable power to place student loan borrowers in REPAYE – even if student loan borrowers contact Defendant and alert Defendant that the student loan borrower did not check Item #2.

78.     Therefore, once Defendant has checked or believes that a borrower has checked Item #2 on the Income-Driven Repayment Plan Request, Defendant can place that borrower in REPAYE, despite the numerous detrimental side-effects REPAYE can and will have on the student loan borrower.

*Plaintiff Was Forced Into REPAYE Against Her Will*

79.     On February 26, 2015, Plaintiff submitted a Federal Direct Consolidation Loan Application and Promissory Note, consolidating her only three non-Direct loans,[6] and an Income-Driven Repayment Plan Request, checking the "IBR" box under "Direct Loan Program Loans."

---

[6] Plaintiff had seven loans that were already Direct student loans.

80.    On April 9, 2015, Defendant sent Plaintiff a letter, stating that she had been approved for IBR and her payments, for her newly consolidated Direct loan, was $0.00.

81.    Plaintiff received a letter from Defendant, showing her recently consolidated Direct loan and providing a payment amount of $0.00 on April 10, 2015, April 26, 2015, and May 27, 2015.

82.    On June 5, 2015, Defendant sent Plaintiff a letter, stating that, as she had submitted a PSLF Employment Certification, all of her loans were being transferred to Defendant.

83.    Plaintiff received a letter from Defendant, showing her recently consolidated Direct loan and providing a payment amount of $0.00 on June 26, 2015, August 27, 2015, October 27, 2015, November 26, 2015, and December 27, 2015.

84.    On December 24, 2015, Defendant sent Plaintiff a letter, stating that Plaintiff's loans were currently under IBR and, therefore, she needed to submit her annual recertification of income and family size by February 26, 2016.

85.    On January 7, 2016, Plaintiff sent Defendant her Income-Driven Repayment Plan Request. A blank Income-Driven Repayment Plan Request is attached, for reference purposes only, as Exhibit A.

86.    Plaintiff's income had increased, so she was unable to recertify using her federal income tax information.

87.    Therefore, Plaintiff *typed* out her Income-Driven Repayment Plan Request, but *signed* it and mailed it in.

88.    For Item #1, "Select the reason you are submitting this form (Check one only)," Plaintiff *typed* and "X" for Box #2: "I am already in an income-driven repayment plan and am submitting documentation for the annual recalculation of my payment. Skip to Item 5."

89.    Plaintiff then skipped and left blank Items #3 and #4, continuing to *type* her responses for Item #5, #6, #7, #8, #9, and #10.

90.    Plaintiff then *signed* and dated the form in a light pen marking.

91.    On January 27, 2016, Plaintiff received a letter from Defendant, showing her recently consolidated Direct loan and providing a payment amount of $0.00.

92.    On February 13, 2016, Defendant sent Plaintiff a letter, showing Plaintiff's seven prior Direct loans and providing a payment amount of $290.20.

93.    Prior to that, Plaintiff was paying less than $100 per month for her loans under her IBR plan; therefore, having heard nothing to the contrary, Plaintiff believed her income-driven request had been processed and this was her new IBR payment amount.

94.    As such, Plaintiff paid this $290.20.

95.    On February 25, 2016, Defendant sent Plaintiff a letter, showing her recently consolidated Direct loan and providing a payment amount of $0.00.

96.    On March 5, 2016, Defendant sent Plaintiff a letter, again showing Plaintiff's seven prior Direct loans and providing a payment amount of $290.20.

97.    Plaintiff paid this $290.20.

98.    On March 27, 2016, Defendant sent Plaintiff a letter, again showing her recently consolidated Direct loan and providing a payment amount of $0.00.

99.    On April 5, 2016, Defendant sent Plaintiff a letter, again showing Plaintiff's seven prior Direct loans and providing a payment amount of $290.20.

100.    Plaintiff paid this $290.20.

101.    On April 13, 2016, Defendant sent Plaintiff a letter, stating:

> We received your request to remove your loans from an Income-Based Repayment (IBR) plan and to repay under another plan. We removed your loans from IBR and placed them on a Standard Repayment plan. In order to complete your repayment plan change, you are required to make a payment under the Standard Repayment plan. If the Standard payment amount is too high, a reduced payment forbearance option may be available. If you qualify, this option allows you to remit a lower payment amount to complete your repayment plan change.
>
> **What's Next**
> You will receive a bill for the Standard payment amount and you must remit payment no later than 15 days after the due date. If you can't afford the payment and need to request a reduced payment forbearance, please contact us. If you do not pay or contact us, you will remain on the Standard Repayment plan.
>
> **Good to Know**
> After you make the requested payment, we will put your account on the repayment plan that you originally selected. We will send you a confirmation letter when that process is complete.

102.    On April 14, 2016, Defendant sent Plaintiff a letter, stating, "The repayment schedule for some of all or your student loans changed. Please review the new Repayment Schedule information on the back of this letter. These new terms take effect on the due date listed. We will send a bill approximately 20 days prior to your due date." There is no information on the back of that letter.

103.    On April 14, 2016, Defendant capitalized $1,135.59, 4,775.63, $114.88, $2,620.17, $4,010.85, $114.88, $2,487.78, and $4,774.90 in accrued interest. In total, $20,034.68 was capitalized – or added to Plaintiff's interest-accruing principal balance.

104.    After receipt of these letters, having no idea what was going on, Plaintiff contacted Defendant by telephone.

105.    Plaintiff informed Defendant that she had been paying her IBR payments since February and wanted an explanation for the April letters and bills.

106.    Defendant told Plaintiff that her Income-Driven Request was just being processed and that Plaintiff had selected to be switched to the plan with the lowest monthly payment.

107.    Plaintiff responded that this was not true and that she had selected to continue on IBR, and Plaintiff requested to continue on her IBR plan, which she had been on before Defendant was assigned to service her student loans, and had been on IBR with Defendant since February of 2016.

108.    Defendant informed Plaintiff that she had no choice and would be routed to the plan with the lowest payment amount, which also required that she either make the standard payment she had already been billed for or she could request a forbearance.

109.    Plaintiff again insisted that she had not selected to switch plans, but rather had selected to remain on her current plan – IBR.

110.    Defendant responded that she had checked the box to allow them to switch Plaintiff, so that is what they did.

111.    Plaintiff asked Defendant what her $290.20 payments, which she had been making since February, had been for; Defendant was unable to provide a response.

112.    Plaintiff insisted that she had not checked a box to allow Defendant to switch her plan and requested a copy of this alleged document.

113.    Thereafter, Defendant provided Plaintiff a copy of Income-Driven Repayment Plan Request. This form was the same that Plaintiff had filled out, <u>except that it now had a heavily marked "X" *written* into Item #2, choosing "(Recommended) I want my loan holder to place me on the plan with the lowest monthly payment."</u>

114.    Plaintiff is as adamant today as she was when she spoke with Defendant in April 2016, that she did not mark Item #2.

115.    Item #2 also states, "Choose a plan and then continue to Item #3" – but there is nothing *typed* or *written* into Item #3 or Item #4, which is how Plaintiff filled it out, because she *typed* in Item #1, which then told her to skip to Item #5.

116.    On April 26, 2016, Defendant sent Plaintiff a letter, showing her newly consolidated Direct loan and providing a payment amount of $210.88.

117.    On May 5, 2016, Defendant sent Plaintiff a letter, showing her seven prior Direct loans and providing a payment amount of $1,947.06.

118.    On May 25, 2016, Defendant sent Plaintiff a letter, stating that she had been approved for a forbearance from June 16, 2016 through July 15, 2016 for her newly consolidated Direct loan and from June 25, 2016 through July 24, 2016 for her prior seven Direct loans.

119.    On June 1, 2016, Defendant capitalized $150.78, $165.26, $52.40, $97.90, $138.80, $52.40, $92.95, and $165.26 in accrued interest. In total, $915.75 was capitalized.

120.    On June 10, 2016, Defendant sent Plaintiff a letter, showing her seven prior Direct loans *in forbearance* and providing for a payment amount of $5.00.

121.    On June 25, 2016, Defendant sent Plaintiff a letter, showing her newly consolidated Direct loan *in forbearance* and providing for a payment amount of $1.30.

122.    On June 26, 2016, Defendant sent Plaintiff a letter, showing her newly consolidated Direct loan *not in forbearance* and providing for a payment amount of $210.88.

123.    On July 5, 2016, Defendant sent Plaintiff a letter, showing her seven prior Direct loans *in forbearance* and providing for a payment amount of $4.35.

124.    On July 5, 2016, Defendant sent Plaintiff a letter, showing her seven prior

Direct loans *not in forbearance* and providing for a payment amount of $2,073.07.

125.    On July 7, 2016, Defendant sent Plaintiff a letter, stating:

> We reviewed your Income-Driven Repayment (IDR) plan form
> and denied your request for the following reasons.
>
> CONFLICTING INFORMATION: You requested to have your
> monthly plan recalculated, but also selected a new repayment plan
> in question 2. Please send a new application, either requesting only
> the recalculation and leaving question 2 blank, or requesting that
> you want to change plans.

126.    On July 13, 2016, Defendant sent Plaintiff a letter, showing her seven

prior Direct loans *in forbearance* from July 25, 2016 through August 15, 2016.

127.    On July 13, 2016, Defendant sent Plaintiff a letter, stating:

> We approved your request for an Income-Driven Repayment
> (IDR) plan. Your new repayment plan is Revised Pay As You Earn
> (REPAYE) for the loans listed. We used your income
> documentation and family size to determine your new monthly
> payment of $379.24 which is first due on 8/16/2016.
>
> Your new monthly payment amount is effective for all payments
> due between 08/16/2016 and 08/01/2017. You are still
> responsible for any payments due before 08/16/2016. About 3
> months prior to 08/01/2017, we will send you notification letting
> you know that you are due to recertify (complete application and
> provide updated income documentation). If you do not recertify,
> any outstanding interest will likely be capitalized and your payment
> amount may increase.

128.    As of July 18, 2016, Defendant placed Plaintiff's newly consolidated

Direct loan into "*delinquent*" status and placed her other seven prior Direct loans into

"*forbearance*" status.

129.    On July 19, 2016, Defendant sent Plaintiff a letter, stating that she had been approved for a *forbearance* from July 16, 2016 through August 15, 2016 for her newly consolidated Direct loan and from July 25, 2016 through August 15, 2016 for her prior seven Direct loans.

130.    On July 26, 2016, Defendant sent Plaintiff a letter, stating that she had accrued $2,213.35 in interest, which would capitalize on August 16, 2016 if she did not pay the amount.

131.    On July 27, 2016, Defendant sent Plaintiff a letter, stating that they had recalculated her monthly payment under REPAYE; as such, her payment was $220.72 and was first due on August 16, 2016.

132.    On August 4, 2016, Defendant sent Plaintiff a letter, stating that they had recalculated her monthly payment under REPAYE; as such, her payment was $379.27 and was first due on September 16, 2016.

133.    On August 6, 2016, Defendant sent Plaintiff a letter, stating that they had recalculated her monthly payment under REPAYE; as such, her payment was $220.72 and was first due on September 16, 2016.

134.    On August 16, 2016, capitalized $210.86, $298.02, $94.53, $176.67, $250.31, $94.53, $167.72, and $298.02 in accrued interest. In total, $1,588.05 was capitalized.

*Defendant is Refusing to Return Borrowers to their Prior Plan without Ramifications*

135.    In addition to improperly switching borrowers out of their chosen income-driven plan, once notified, Defendant fails to place student loan borrowers in the correct plan, without any ramifications to the student loan borrower.

136.    When Plaintiff discovered that Defendant had changed her repayment plan from IBR to REPAYE, she contacted Defendant and told Defendant that she had been on IBR, she had requested to remain on IBR when she recertified, and she wanted to continue on IBR, rather than being switched into a new repayment plan.

137.    Defendant told Plaintiff that she could not remain on IBR (which is false), that she had no choice except to be routed by Defendant to the plan with the lowest payment amount (which is false), which also required that she either make a standard payment or she could request a forbearance.

138.    After Defendant told Plaintiff she had no other choice, and because Plaintiff feared adverse financial consequences, she agreed to a one-month forbearance with a reduced payment amount.

139.    However, Defendant told Plaintiff it was too late for that payment, but she would rather have to undergo a deferment, instead.

140.    As such, Defendant placed Plaintiff on a deferment for April 2016 and processed a forbearance request for May 2016.

*Defendant Utilizing an Income-Driven Repayment Request Process that Takes More than One Month, as "Time is Money" for Defendant*

141. Defendant is utilizing an income-driven repayment plan request processing procedure that takes many, many months – to the detriment of the student loan borrower, but the benefit of the student loan holder and servicer.

142. For instance, while the Higher Education Act contemplates a one-month period to switch a borrower to REPAYE, Defendant's REPAYE processing procedure actually takes many, many months.

143. The reason is simple – for Defendant, "time is money."

144. As described above, under Defendant's contract with the federal government, Defendant makes $2.11 per month for each student loan borrower who is in grace or a current repayment plan – but only up to 3 million student loan borrowers.

145. After Defendant has 3 million student loan borrowers in grace or repayment, they then only make $1.90 per month for each additional student loan borrower in grace or repayment.

146. However, for up to 1.6 million borrowers in forbearance or deferment, Defendant makes $2.07 per month – or $0.17 per month more than if that borrower had been in repayment.

147. Therefore, once Defendant has 3 million borrowers in grace or repayment status, Defendant makes more money on the next 1.6 million people by having them in forbearance or deferment, rather than in repayment.

148. The financial incentive in doing this can be significant: up to $272,000 per month or $3,264,000 per year.

149. Additionally, as described above, Defendant can get interest subsidies and special allowance payments when the amount of a student loan borrower's accrued interest increases.

150. As student loan borrowers accrued interest continues to capitalize while they are in forbearance and waiting for their switch to REPAYE, the longer they are in forbearance, the more their principal and accrued interest increases.

151. This means that each month that Defendant can delay processing a request, and place student loan borrowers in forbearance or deferment instead, Defendant is often able to collect additional amounts in the form of monthly contractual payments, interest subsidies, and special allowance payments.

152. In fact, on information and belief, Defendant *automatically* processes two months of forbearance every time they tell borrowers they are processing an administrative forbearance, without alerting the borrower of this or seeking their permission to do so.

153.    Finally, Defendant saves costs by having a lengthy processing time, as Defendant does not have to hire as many employees as would be required to timely process all of its income-driven requests.

### It Took Many, Many Months for Defendant to Process Plaintiff's Income-Driven Plan Request

154.    On December 24, 2015, Defendant sent Plaintiff a letter, stating that Plaintiff's loans were currently under IBR and, therefore, she needed to submit her annual recertification of income and family size by February 26, 2016.

155.    On January 7, 2016, Plaintiff sent Defendant her Income-Driven Repayment Plan Request.

156.    It was not until April 13, 2016, more than 3 months later, that Defendant sent Plaintiff a letter, stating:

> We received your request to remove your loans from an Income-Based Repayment (IBR) plan and to repay under another plan. We removed your loans from IBR and placed them on a Standard Repayment plan. In order to complete your repayment plan change, you are required to make a payment under the Standard Repayment plan. If the Standard payment amount is too high, a reduced payment forbearance option may be available. If you qualify, this option allows you to remit a lower payment amount to complete your repayment plan change.
>
> **What's Next**
> You will receive a bill for the Standard payment amount and you must remit payment no later than 15 days after the due date. If you can't afford the payment and need to request a reduced payment forbearance, please contact us. If you do not pay or contact us, you will remain on the Standard Repayment plan.

**Good to Know**
After you make the requested payment, we will put your account on the repayment plan that you originally selected. We will send you a confirmation letter when that process is complete.

157.    On April 14, 2016, Defendant sent Plaintiff a letter, stating, "The repayment schedule for some of all or your student loans changed. Please review the new Repayment Schedule information on the back of this letter. These new terms take effect on the due date listed. We will send a bill approximately 20 days prior to your due date." There is no information on the back of that letter.

158.    Then, on April 14, 2016, Defendant capitalized $1,135.59, 4,775.63, $114.88, $2,620.17, $4,010.85, $114.88, $2,487.78, and $4,774.90 in accrued interest. In total, $20,034.68 was capitalized.

159.    On April 26, 2016, Defendant sent Plaintiff a letter, showing her newly consolidated Direct loan and providing a payment amount of $210.88.

160.    On May 5, 2016, Defendant sent Plaintiff a letter, showing her seven prior Direct loans and providing a payment amount of $1,947.06.

161.    On May 25, 2016, Defendant sent Plaintiff a letter, stating that she had been approved for a *forbearance* from June 16, 2016 through July 15, 2016 for her newly consolidated Direct loan and from June 25, 2016 through July 24, 2016 for her prior seven Direct loans.

162.    On June 1, 2016, capitalized $150.78, $165.26, $52.40, $97.90, $138.80, $52.40, $92.95, and $165.26 in accrued interest. In total, $915.75 was capitalized.

163.    On June 10, 2016, Defendant sent Plaintiff a letter, showing her seven prior Direct loans *in forbearance* and providing for a payment amount of $5.00.

164.    On June 25, 2016, Defendant sent Plaintiff a letter, showing her newly consolidated Direct loan *in forbearance* and providing for a payment amount of $1.30.

165.    On June 26, 2016, Defendant sent Plaintiff a letter, showing her newly consolidated Direct loan *not in forbearance* and providing for a payment amount of $210.88.

166.    On July 5, 2016, Defendant sent Plaintiff a letter, showing her seven prior Direct loans *in forbearance* and providing for a payment amount of $4.35.

167.    On July 5, 2016, Defendant sent Plaintiff a letter, showing her seven prior Direct loans *not in forbearance* and providing for a payment amount of $2,073.07.

168.    On July 7, 2016, Defendant sent Plaintiff a letter, stating:

> We reviewed your Income-Driven Repayment (IDR) plan form and denied your request for the following reasons.
>
> CONFLICTING INFORMATION: You requested to have your monthly plan recalculated, but also selected a new repayment plan in question 2. Please send a new application, either requesting only the recalculation and leaving question 2 blank, or requesting that you want to change plans.

169.    On July 13, 2016, Defendant sent Plaintiff a letter, showing her seven prior Direct loans *in forbearance* from July 25, 2016 through August 15, 2016.

170.    On July 13, 2016, Defendant sent Plaintiff a letter, stating:

> We approved your request for an Income-Driven Repayment (IDR) plan. Your new repayment plan is Revised Pay As You Earn

(REPAYE) for the loans listed. We used your income documentation and family size to determine your new monthly payment of $379.24 which is first due on 8/16/2016.

Your new monthly payment amount is effective for all payments due between 08/16/2016 and 08/01/2017. You are still responsible for any payments due before 08/16/2016. About 3 months prior to 08/01/2017, we will send you notification letting you know that you are due to recertify (complete application and provide updated income documentation). If you do not recertify, any outstanding interest will likely be capitalized and your payment amount may increase.

171.    As of July 18, 2016, Defendant placed Plaintiff's newly consolidated Direct loan into "*delinquent*" status and placed her other seven prior Direct loans into "*forbearance*" status.

172.    On July 19, 2016, Defendant sent Plaintiff a letter, stating that she had been approved for a *forbearance* from July 16, 2016 through August 15, 2016 for her newly consolidated Direct loan and from July 25, 2016 through August 15, 2016 for her prior seven Direct loans.

173.    On July 26, 2016, Defendant sent Plaintiff a letter, stating that she had accrued $2,213.35 in interest, which would capitalize on August 16, 2016 if she did not pay the amount.

174.    On July 27, 2016, Defendant sent Plaintiff a letter, stating that they had recalculated her monthly payment under REPAYE; as such, her payment was $220.72 and was first due on August 16, 2016.

175.   On August 4, 2016, Defendant sent Plaintiff a letter, stating that they had recalculated her monthly payment under REPAYE; as such, her payment was $379.27 and was first due on September 16, 2016.

176.   On August 6, 2016, Defendant sent Plaintiff a letter, stating that they had recalculated her monthly payment under REPAYE; as such, her payment was $220.72 and was first due on September 16, 2016.

177.   On August 16, 2016, capitalized $210.86, $298.02, $94.53, $176.67, $250.31, $94.53, $167.72, and $298.02 in accrued interest. In total, $1,588.05 was capitalized.

178.   On or about September 15, 2016, Plaintiff began paying $220.72 monthly, as stated by Defendant's August 6, 2016 letter.

179.   As such, while Plaintiff sent in her income-driven annual recertification in January of 2016, due to Defendant's unlawful acts, she was not able to start making income-driven payments until September of 2016, more than 8 months later.

### The CFPB's Warnings to Student Loan Servicers

180.   Prior to Defendant's unfair, deceptive, and illegal acts, the Consumer Financial Protection Bureau ("CFPB") issued its September of 2015 report, titled

"Student Loan Servicing: Analysis of Public Input and Recommendations for Reform."[7]

181.    The CFPB's report details many actions, processes, and procedures undertaken by student loan servicers, which are often the exact unfair, deceptive and illegal practices Defendant is often engaging in.

182.    Obviously, Defendant did not follow the CFPB's recommendations or reform its actions, as Defendant continued to engaged in these actions, processes, and procedures even after the release of the September 2015 report, which stated, in relevant part:

> For borrowers experiencing financial hardship, flexible repayment options can be a powerful tool to keep borrowers on track to satisfy their obligations, particularly income-driven plans available to the vast majority of borrowers with federal loans experiencing financial distress. (Page 17-18)
>
> **Periods of nonpayment, such as forbearance, can significantly increase the amount of unpaid interest, cause borrowers' total debt to grow, and ultimately prevent borrowers from making progress toward satisfying their obligation to repay the debt owed.** (Page 25)(emphasis added)
>
> **Federal student loan borrowers may be enrolled in a repayment plan that does not reflect their choice due to paperwork processing errors.** Borrowers with federal student loans can request that their student loan servicer select the income-driven repayment plan with the lowest monthly payment, an option designed to assist borrowers when selecting between multiple, seemingly-similar options. **Comments from**

---

[7] Available at http://files.consumerfinance.gov/f/201509_cfpb_student loan-servicing-report.pdf (last accessed October 18, 2016).

**individual student loan borrowers and borrower assistance organizations state that servicers may enroll borrowers in a repayment plan that does not reflect the borrower's choice and borrowers must contact their servicer a second time to re-enroll in the plan with the lowest monthly payment amount.** (Page 27-28)(emphasis added)

**Borrowers report encountering delays and processing errors when attempting to certify income while enrolling in an income-driven repayment plan.** … Other borrower comments note that processing delays may lead to missed payments, late fees, or unnecessary use of forbearance. (Page 29)

Federal rules for these repayment plans include significant negative consequences for borrowers who continue to be eligible for PFH payments and wish to remain enrolled, but for whom recertification is not timely, such as: **Payment shock**. **When borrowers' recertification is not timely, borrowers receive billing statements reflecting a monthly payment calculation based on the amount they would have owed under the standard 10-year repayment plan prior to entering an income-driven repayment plan (known as the permanent standard payment amount)**. (Page 33)(emphasis added)

Borrowers who have high debt or low income over a long period of time can still satisfy their financial obligations by continuing to make on-time PFH payments, even if these payments are not high enough to pay down principal. For these borrowers enrolled in income-driven repayment plans, every month that they make a qualifying payment satisfies a prerequisite to obtain loan forgiveness. **However, if a servicer fails to promptly process an application for either of these repayment plans, a borrower may experience two kinds of negative consequences. First, a borrower may be forced to pay the higher monthly payment, thus decreasing the amount entitled to be forgiven. Second, delayed processing could force a borrower to use forbearance, thus extending the eligibility date for forgiveness by each month that it takes to approve the recertification application. Both of these could result in hundreds or thousands of dollars in additional extra payments paid by the borrower.** Commenters identify specific problems related to recertification, including issues involving notices, paperwork processing delays, and incorrect information from customer service personnel. **As outlined above, the costs to borrowers who do**

**not have a timely recertification processed by their student loan servicers can be substantial.** (Page 34-35)(emphasis added)

Moreover, if a borrower submits income documentation and a recertification application within 10 days of the annual recertification deadline, the servicer is required to maintain the current payment amount until the income documentation is processed and the new payment amount can be calculated. Although this regulation protects these borrowers against the payment shock that results from a failure to recertify on time, **some borrowers could face interest capitalization, forfeited interest subsidy, or delayed loan forgiveness, depending on servicers' policies.** Comments from student loan borrowers suggest that servicers may not consistently apply the protection against payment shock, despite federal regulatory requirements. **Commenters note that borrowers may submit the required paperwork but servicers may take up to two months to process an application, during which the borrowers' annual recertification deadlines may pass.** Comments from borrowers also state that processing delays may cause borrowers' payments to revert to their standard 10-year monthly payments, even if paperwork is received by the deadline. (Page 36-37)(emphasis added)

183.    Then, in August of 2016, the CFPB issued its "Midyear Update on Student Loan Complaints: Income-driven Repayment Plan Application Issues" (available at:

http://files.consumerfinance.gov/f/documents/201608_cfpb_StudentLoanO mbudsmanMidYearReport.pdf). This publication describes the exact unfair, deceptive and illegal practices Defendant is engaging in:

**The Bureau handled complaints from borrowers describing IDR application processing delays that last weeks or months, during which these borrowers lose out on protections that can lower their monthly payment, save them money on interest charges, and start them on the path to loan forgiveness.** Many student loan borrowers are able to complete the application process for an IDR plan online at www.studentloans.gov, supplemented by tax information provided

electronically by the Internal Revenue Service. For these borrowers, a student loan servicer need only validate the information provided, and approve or deny the application. However, consumers seeking to apply online in this manner report encountering costly and cumbersome delays. (Page 3)(emphasis added)

Borrowers report that servicers reject borrowers' applications without providing borrowers the opportunity to fix mistakes or update documentation. **Instead of facilitating these borrowers' enrollment in their requested IDR plan, clumsy or flawed IDR enrollment practices mean borrowers are unlikely to obtain an affordable repayment option.** … These borrowers rely on their student loan servicer to evaluate whether borrowers' supporting documentation is sufficient to approve or deny an enrollment application, and to work with them to address any deficiencies in their application. However, consumers report surprise rejections that can lead to payment shocks, delayed benefits, and increased interest charges. (Page 3)(emphasis added)

**When borrowers seek to investigate potential repayment options and contact their lender or servicer to obtain information, complaints reveal that some of these borrowers may receive responses that servicers do not or were unable to offer an alternative repayment plan.** (Page 12)(emphasis added)

The Bureau has repeatedly discussed widespread problems reported by consumers related to student loan servicing practices, and in particular, practices related to IDR plans. To date, we have focused on two key areas where there is a mismatch between borrower expectations and actual service delivered. **First, we described problems identified by consumers related to the information provided by student loan servicers regarding available repayment options.** These include concerns raised by borrowers related to practices by some servicing personnel that drive borrowers into short-term alternatives such as forbearance, instead of longer-term options that may be better suited to meet many borrowers' needs. **Second, we highlighted problems borrowers described when seeking to maintain an income-driven monthly payment amount, including issues related to servicer communications regarding borrowers' obligation to recertify income and family size under these plans.** This report focuses on a **third key area in the lifecycle of a student loan borrower enrolled in**

**an IDR plan—the processing of application paperwork and other obstacles related to IDR enrollment.** (Page 14)(emphasis added)

**In particular, consumer complaints continue to cite IDR enrollment issues that result in lost interest subsidy benefits, potentially delay eligibility for loan forgiveness benefits, and trigger unnecessary capitalization of interest.** (Page 16)(emphasis added)

To enroll in an IDR plan, borrowers are required to submit an application, along with proof of income and family size, to their servicer for review and processing. This application may be submitted online through www.studentloans.gov—an information system managed by the Department of Education—or via paper application, submitted directly to a student loan servicer. **In both cases, servicers target processing IDR applications within 15 days.** (Page 16-17)(emphasis added)

**Servicers' failure to timely process these applications can be detrimental to borrowers. Borrower complaints note that IDR applications may take weeks or months to process, delaying borrowers' access to the consumer protections described above. Furthermore, when borrowers' enrollment in IDR is delayed, they may be subject to otherwise avoidable harms, such as increased loan balances and loss of benefits.** (Page 18)(emphasis added)

Borrowers complain that their loan balances grow due to the accrual and capitalization of interest during extended application processing periods. Generally, servicers will place a borrower's loans into administrative forbearance for up to 60 days while processing an initial IDR application. During periods of forbearance, interest continues to accrue. However, unlike other types of forbearance, interest accrued during a period of administrative forbearance will not capitalize (i.e., will not be added on to a borrower's principal balance) if an application is processed and the borrower is successfully enrolled in IDR during this period. **However, borrowers report that servicers may take longer than 60 days to process their applications, even when these applications are complete and submitted timely. Borrowers complain that their administrative forbearance period expires before their application is processed, and only learn of the expiration of forbearance when they receive an unexpected bill indicating that they owe a payment set at their prior, standard 10-year amount. For some borrowers, this can also result in the capitalization of unpaid interest charges,**

**potentially increasing loan balances by hundreds or even thousands of dollars.** (Page 19)(emphasis added)

Delayed IDR enrollment also delays and decreases borrowers' potential loan forgiveness. Borrowers enrolled in an IDR plan are entitled to forgiveness of any remaining loan balance after 20 or 25 years of qualified payments. If these borrowers are employed in public service, they can receive loan forgiveness after 10 years of qualified payments. **Borrowers complain that their servicer's delayed processing of their IDR applications is obstructing their road to repayment, and effectively reducing any loan forgiveness benefit they may ultimately receive.** One borrower notes: [My servicer] still [has] not completed the processing of my application. . . . This delay . . . is creating a hardship on me, as it is lengthening the amount of time I remain in debt and delays my final repayment date back as many months as [my servicer is] unable to get me into the new repayment plan. I am also enrolled in the Public Service Loan Forgiveness program, so the "clock" on my maximum 10-year repayment time span has essentially stopped. ... (Page 20)(emphasis added)

**In effect, borrowers using forbearance forgo qualifying months at their present income and family size and assume an obligation to make future monthly payments—in some circumstances, borrowers may experience future wage growth that makes these monthly payments substantially higher than payments based on their current income and family size. For these borrowers, processing delays can result in higher future payments that may further increase the total lifetime cost of their loan.** (Footnote 19) (emphasis added)

**It is also important to note that in both cases described above, the borrowers would miss out on progress toward loan forgiveness during any month in which the borrowers needed to use forbearance to postpone an unaffordable monthly payment.** In effect, because each borrower must still make 240 months of qualifying payments in total, not including any months spent in forbearance, each borrower forgoes qualifying months toward loan forgiveness in the near term, but remains obligated to make additional monthly payments in the future. **This may prove particularly costly if either borrower experiences wage growth, causing future qualifying payments to be calculated based on a higher income.** As these examples demonstrate, there are multiple touch points during the IDR application process where processing delays

can lead to substantial increases in costs for consumers. (Page 28)(emphasis added)

**Borrowers on an IDR plan can expect to recertify income and family size as many as 24 times during the life of their loan. If a single application processing delay can increase a borrower's loan balance by over $1000, delays during each annual recertification process could cause a borrower's loan balance to increase by tens of thousands of dollars.** (Page 28)(emphasis added)

*Defendant's Deceptive, Vague, Incomplete and Inaccurate Description of REPAYE, Systematic Switching of Borrowers to REPAYE, and Intentional Utilization of a REPAYE Process that Takes More than One Month*

184.  To increase its profits, Defendant routinely engages in unfair, deceptive, and illegal practices that allow student loan holders to gain extra fees, interest, and payments from borrowers that they would not be entitled to if the borrower was not switched to REPAYE.

185.  Further, Defendant's unfair, deceptive, and illegal practices allow themselves, as the student loan servicers, to gain extra amounts through monthly payments, interest subsidies and special allowance payments from borrowers that they would not be entitled to if the borrower was not switched to REPAYE.

186.  Defendant accomplishes this goal by using deception to convince borrowers to switch to REPAYE, forcing borrowers to switch to REPAYE, and by employing a REPAYE processing procedure that takes more than one month.

187.  Through this Complaint, Plaintiff seeks declaratory and injunctive relief, as well as compensation, on her own behalf and on behalf of a class of those similarly

situated, for the violation of various laws, including but not limited to, the unfair,

deceptive, and illegal acts and practices of Defendant.

188. Some of Defendant's acts include, but are not limited to:

a) failing to fully, clearly, and accurately describe REPAYE to student loan borrowers, thereby fraudulently coercing student loan borrowers to switch to REPAYE when it is not in his or her best interest,

b) forcing student loan borrowers to switch to REPAYE,

c) refusing to return improperly switched student loan borrowers from REPAYE to their previously chosen plan (IBR, ICR, or PAYE) without any ramifications to the student loan borrower,

d) employing a REPAYE processing procedure that lasts more than one month;

e) charging extra fees the student loan borrower would not have to pay if the borrower was not switched to REPAYE,

f) charging extra standard, full payments the student loan borrower would not have to pay if the student loan borrower did not switch to REPAYE,

g) charging extra capitalized interest Defendant would not be entitled to if the student loan borrower was not switched to REPAYE,

h) charging extra interest on that capitalized interest/capital Defendant would not be entitled to if the student loan borrower was not switched to REPAYE, and

i) charging extra higher payments when the student loan borrower has to pay his or her final months of REPAYE at a higher, time-adjusted wage because his or her required months were extended only because they switched to REPAYE.

189. In short, Defendant has created a system that vaguely and/or inaccurately

describes REPAYE, coerces or forces student loan borrowers (who were involuntarily

assigned to Defendant) to switch to REPAYE, and utilizes a REPAYE process that

unnecessarily lasts more than one month – in order to increase Defendant's and student loan holder's profits, and most certainly not to place student loan borrowers in the best plan for them. As such, Defendant are operating in a way most beneficial to themselves and, often, in a manner directly opposite of that requested by the student loan borrower.

190.    Therefore, Plaintiff and all others similarly situated have been damaged as a direct and proximate result of Defendant's willful and intentionally deceptive conduct, warranting punitive damages for Defendant's irreprehensible behavior and injunctive relief to prevent Defendant from continuing to coerce or force struggling student loan borrowers to switch to REPAYE and prevent Defendant from having a REPAYE process that takes more than one month.

## CLASS ACTION ALLEGATIONS

191.    Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of herself and classes of persons similarly situated for declaratory, injunctive, and monetary relief, and defined as:

**Unfair and Deceptive Practices Class**
All individuals who currently have or since March 1, 2014 have had Defendant as his or her student loan servicer, and have been subject to Defendant's unfair and deceptive business practices, as outlined below in Count I, and who have suffered damages due to Defendant's unfair and deceptive practices.

**Constructive Fraud Class**
All individuals who since March 1, 2012 were subjected to Defendants' unfair, misleading, and/or deceptive conduct, as further described below in Count III, and who have suffered damages do to Defendant's unlawful acts.

**Unjust Enrichment Class**
All individuals who since March 1, 2013 were placed in forbearance by Defendant for more than one month after applying for an income-driven repayment plan who suffered damages as a result of Defendant's acts.

192.    Specifically excluded from the Unfair and Deceptive Practices Class (the "Class") and the Constructive Fraud Class, and the Unjust Enrichment Class (collectively, the "Classes") are: (a) any officers, directors, or employees of Defendant, or any of their subsidiaries; (b) any judge assigned to hear this case (or spouse or family member of any assigned judge); (c) any employee of the Court; and (d) any juror selected to hear this case.

193.    Plaintiff asserts claims against Defendant, individually and on behalf of all members of the Classes for violations of the law as indicated and set forth below.

194.    The members of the Classes are ascertainable from objective criteria.

195.    If necessary to preserve the case as a class action, the Court itself can redefine the Classes, create additional classes or sub-classes, or both.

196.    Additionally, Plaintiff reserves the right to move for certification of the Classes as defined herein, or a class or subclass with a different definition, as to be determined by Plaintiff after the completion of discovery. As discovery unfolds, additional classes or modified classes might be possible or necessary. However, as it appears, on information and belief, that Defendant's illegal affected similarly situated individuals throughout the United States, a single nationwide class brought pursuant to Pennsylvania law, to which Defendant is clearly subject, is best-suited for this action

and places Defendant on notice of the broadest possible class that Plaintiff could move for, as implied by the Federal Rules' notice-pleading standard.

197. The requirements of Rule 23(a) are satisfied for the proposed Class and Subclass because the members of the proposed Class and Subclass are so numerous and geographically dispersed that joinder of all its members is impracticable. Although the exact number and identity of each Class and Subclass member is unknown at this time, there are believed to be at least thousands of potential Class and Subclass members. Therefore, the "numerosity" requirement of Rule 23(a)(1) is met.

198. The commonality requirement of Rule 23(a)(2) is satisfied because there are questions of law or fact common to Plaintiff and the other members of the proposed Class and Subclass. Among those common questions of law or fact are:

    a.    whether Defendant, through its acts or omissions, engaged in fraudulent and deceptive conduct which creates a likelihood of confusion or misunderstanding by making fraudulent misrepresentations about REPAYE to student loan borrowers, including failing to fully, clearly, and accurately describe REPAYE – and its negative implications – to student loan borrowers, thereby coercing or fraudulently misleading student loan borrowers to switch to REPAYE when it is not in the student loan borrowers' best interest;

    b.    whether Defendant, through its acts or omissions, engaged in fraudulent and deceptive conduct which creates a likelihood of confusion or misunderstanding by altering student loan borrower's applications and switching student loan borrowers to REPAYE against their will;

    c.    whether Defendant, through its acts or omissions, engaged in fraudulent and deceptive conduct which created a likelihood of confusion or misunderstanding by refusing to return improperly

switched REPAYE student loan borrowers to their chosen, prior plan without any ramifications to the student loan borrower;

d.    whether Defendant, through its acts or omissions, engaged in fraudulent and deceptive conduct which creates a likelihood of confusion or misunderstanding by employing a REPAYE processing procedure that lasts more than one month;

e.    whether Defendant's actions were willful, intentional, and taken in bad faith;

f.    whether Plaintiff and the members of the proposed Classes have sustained or continue to sustain damages as a result of Defendant's wrongful conduct, and, if so, the proper measure and appropriate formula to be applied in determining damages for the injuries sustained;

g.    whether Plaintiff and the members of the proposed Classes are entitled to compensatory, consequential, exemplary, and punitive damages; and

h.    whether Plaintiff and the members of the proposed Classes are entitled to declaratory, injunctive, or other equitable relief.

199.   Plaintiff's claims are typical of the claims of the proposed Classes that she seeks to represent, as described above, because they arise from the same course of conduct by Defendant and are based on the same legal theories. Further, Plaintiff seeks the same form of relief for herself and the proposed Classes. Therefore, the "typicality" requirement of Rule 23(a)(3) is satisfied.

200.   Because her claims are typical of the proposed Classes that Plaintiff seeks to represent, Plaintiff has every incentive to pursue those claims vigorously. Plaintiff has no conflicts with, or interests antagonistic to the proposed Classes. Plaintiff, a

victim of unscrupulous student loan collection and general business practices, is committed to the vigorous prosecution of this action, which is reflected in her retention of competent counsel experienced in complex and challenging litigation.

201.    Plaintiff's counsel satisfies the requirements of Rule 23(g) to serve as counsel for the proposed Classes. Plaintiff's counsel (a) has identified and thoroughly investigated the claims set forth herein; (b) has previously been counsel in student loan servicer litigation; (c) has been involved in complex class litigation; (d) has extensive knowledge of the applicable law; and (d) has the resources to commit to the vigorous prosecution of this action on behalf of the proposed Classes. Accordingly, Plaintiff satisfies the adequacy of representation requirements of Rule 23(a)(4).

202.    In addition, this action meets the requirements of Rule 23(b)(2). Defendant has acted or refused to act on grounds generally applicable to Plaintiff and others similarly situated, making final injunctive or corresponding declaratory relief with respect to the proposed Classes appropriate.

203.    This action also meets the requirements of Rule 23(b)(3). Common questions of law or fact, including those set forth above, exist as to the claims of all members of the proposed Classes and predominate over questions affecting only individual Class members, and a class action is superior – if not the only method – for the fair and efficient adjudication of this controversy.

204.    Class treatment will permit large numbers of similarly situated student loan borrowers to prosecute their respective claims in a single forum simultaneously,

efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce.

205. This action is manageable as a class action. Notice may be provided to members of the proposed Classes by first-class mail and through the alternative means, including electronic mail (email), internet postings including banner ads, distribution through social media, including sponsored postings on Facebook and Twitter, and by publication. Thus, the superiority and manageability requirements of Rule 23(b)(3) are satisfied.

## COUNT I – VIOLATION OF PENNSYLVANIA'S UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

206. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

207. Pursuant to Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2(3):

> "Trade" and "commerce" mean "the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth."

208. Defendant's student loan servicing business qualifies as "trade" and "commerce" as defined by 73 P.S. § 201-2(3).

209. Pursuant to Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2(4):

"Unfair methods of competition" and "unfair or deceptive acts or practices" mean any one or more of the following:

(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

...

(xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

210.    To increase its profits, Defendant represented and, upon information and belief, still represents that its services have benefits that they do not have and routinely engage in fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding that allows student loan holders to gain extra fees, interest, and payments from student loan borrowers and allows themselves, as student loan servicers, to gain extra monthly payments, interest subsidies and special allowance payments that they would not be entitled to if a student loan borrower was not switched to REPAYE.

211.    Defendant accomplishes this by fraudulently misrepresenting REPAYE's material facts, coercing borrowers to switch to REPAYE or switching borrowers to REPAYE against their will, representing that they are unable to return those student loan borrowers to their prior, chosen plan without any cost or delay to the borrower, and by intentionally employing a REPAYE processing procedure that lasts more than one month.

212.    Pursuant to Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-9.2. Private Actions:

(a) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by 9 73 P.S. § 201-3. 10 73 P.S. §§ 201-4, 201-4.1. 11 73 P.S. §§ 201-2, 201-4.1. 12 73 P.S. § 201-4. 11 section 313 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.

(b) Any permanent injunction, judgment or order of the court made under section 414 of this act shall be prima facie evidence in an action brought under section 9.215 of this act that the defendant used or employed acts or practices declared unlawful by section 3 of this act.

213. Through this Complaint, Plaintiff seeks declaratory and injunctive relief, as well as compensation, on her own behalf and on behalf of those similarly situated, for Defendant's violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Laws, including but not limited to, the unfair or deceptive acts or practices of Defendant as described in detail herein.

214. Some of Defendant's unfair or deceptive acts or practices include, but are not limited to:

    a)    fraudulently misrepresenting REPAYE's material terms, including failing to fully, clearly, and accurately explain REPAYE's material terms, thereby coercing student loan borrowers to switch to REPAYE when it is not in his or her best interest,

    b)    falsifying borrower's income-driven repayment applications,

c)     enrolling student loan borrower's in REPAYE against their will,

d)     refusing to return improperly switched REPAYE borrowers to their previous plan (IBR, ICR or PAYE) without any cost or delay to the student loan borrower,

e)     intentionally causing student loan borrower's REPAYE process to last more than one month;

f)     charging extra fees the student loan borrower would not have to pay if the student loan borrower did not switch to REPAYE,

g)     charging extra standard, full payments the student loan borrower would not have to pay if the student loan borrower was not switched to REPAYE,

h)     charging extra capitalized interest Defendant would not be entitled to if the student loan borrower was not switched to REPAYE,

i)     charging extra interest on that capitalized interest or principal Defendant would not be entitled to charge or collect if the student loan borrower was not switched to REPAYE,

j)     charging extra higher payments when the student loan borrower has to pay his or her final months of REPAYE at a higher, time-adjusted wage because his or her required months were extended due to Defendant involuntarily enrolling the student loan borrower in REPAYE.

215.   In short, Defendant has created a system that vaguely and inaccurately describes REPAYE, coerces or forces student loan borrowers to switch to REPAYE, and utilizes a REPAYE process that intentionally unnecessarily lasts more than one month – in order to increase their profits, not to place borrowers in the best plan for them.

216.   As such, Defendant is operating in a way most beneficial to itself and, often, in a manner directly opposite of that requested by the student loan borrower, despite Defendant holding itself out as acting in the best interest of the student loan borrower.

217.   As such, Plaintiff and all others similarly situated have been damaged as a direct and proximate result of Defendant's willful and intentionally deceptive conduct, warranting punitive damages for Defendant's irreprehensible behavior and injunctive relief to prevent Defendant from inaccurately describing REPAYE, coercing or forcing struggling student loan borrowers to switch to REPAYE, refusing to return improperly switched REPAYE student loan borrowers to their previously chose repayment plan with no ramifications to the student loan borrowers, and having a REPAYE process that takes more than one month.

218.   Defendant's practices, as set forth above, were unfair, fraudulent or deceptive in that:

  a. The practices were immoral, oppressive and unscrupulous in that they imposed upon student loan borrowers with no meaningful choice, imposed an unreasonable burden on student loan borrowers and was so oppressive as to leave student loan borrowers with little alternative but to submit to the practices. Student loan borrowers had no control over the Defendant's acts, and student loan borrowers attempts to ensure that were on the correct and most beneficial plan for themselves were futile, and

b. Student loan borrowers cannot reasonably avoid the injury caused by Defendant, as Defendant is in ultimate control of their website, their processing of income-driven student loan applications, their processing of income-driven student loan plans, and Defendant routinely mislead and coerced student loan borrowers, routinely alter student loan borrowers' documents, and/or refuse to follow student loan borrowers' instructions.

219.    Defendant's unfair and deceptive acts and practices and conduct were directed toward Plaintiff and other Class members.

220.    Defendant intended for student loan borrowers, including Plaintiff and Class members, to rely on their acts and practices in determining which income-driven student loan repayment plan was best for the student loan borrowers, in being placed in the correct income-driven student loan repayment plan for the student loan borrowers, and in having their income-driven student loan repayment plans processed and carried out in an effective and efficient manner.

221.    Defendant also intended for student loan borrowers, including Plaintiff and Class members, to rely on Defendant's documents, correspondence, loan billing statements, emails and website as correct, even though the website contained vague, inaccurate, and misleading information and many other documents were often incorrect and sent in a manner meant to confuse and mislead student loan borrowers.

222.    As such, Defendant intended for student loan borrowers to rely on their fraudulent or deceptive conduct and, therefore, create or cause a likelihood of

confusion or of misunderstanding about the best income-driven student loan repayment plans for the student loan borrowers, how he or she could be treated after requesting to return to his or her previous plan, and how his or her income-driven student loan repayment plan was to be processed and carried out.

223.    Defendant's unfair or deceptive acts or practices occurred during the course of conduct involving trade or commerce, specifically the presentation of information involving services to collect income-driven student loan repayment plans, the processing of services to collect income-driven student loan repayment plans, and the carrying out of services to collect income-driven student loan repayment plans.

224.    Plaintiff and Class members justifiably relied on Defendant's unfair or deceptive acts or practices and incurred damages due to (1) the misleading, vague, and inaccurate information displayed by Defendant about the different income-driven student loan repayment plans, (2) being coerced or forced into an income-driven student loan repayment plan that was not the best for them, (3) being unable to return to their previously chosen income-driven student loan repayment plan without ramifications, and (4) Defendant's REPAYE processing that lasts more than one month.

225.    Plaintiff's and Class members' damages were directly and proximately caused by Defendant's unfair acts or deceptive acts or practices.

226.    Defendant's conduct was addressed to the market generally and otherwise implicates consumer protection concerns and, therefore, a consumer nexus exists in that:

a. Defendant's acts and practices in collecting student loans payments, supplying vague, incorrect, and misleading information, altering student loan borrower's paperwork, impermissibly enrolling student loan borrowers in repayment plans which they did not consent to, failing to return student loan borrowers to the correct plan, and utilizing a REPAYE processing system that is not effective and efficient; and

b. Defendant's acts and practices otherwise implicate consumer protection concerns including, but not limited to, promoting fair and upright business practices.

227.    Plaintiff is authorized to bring a private action under the Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-9.2.

228.    Defendant's conduct was outrageous and done with a bad motive or with reckless indifference to the interests of others. Punitive damages are thus warranted, in order to deter Defendant and others from engaging in similar conduct in the future, as well as to provide additional compensation, retribution and an incentive to prevent injustices that might otherwise go unredressed.

229.    Reasonable attorneys' fees and costs should be awarded pursuant to 73 P.S. § 201-9.2.

## COUNT II – NEGLIGENT MISREPRESENTATION

230.    Plaintiffs incorporates by reference all preceding paragraphs as if fully set forth herein.

231.    To increase its profits, Defendant, in the course of its business, profession or employment, or any other transaction in which they have a pecuniary interest, supplied false information for the guidance of others that allow student loan holders to gain extra fees, interest, and payments from borrowers and student loan servicers, such as themselves, to gain extra monthly payments, interest subsidies and special allowance payments that they would not be entitled to if a borrower did not switch to REPAYE.

232.    Defendant accomplishes this by providing false information and misrepresenting material facts about REPAYE, coercing borrowers to switch to REPAYE through the misrepresentation of fact, or by fraudulently representing that it is unable to return borrowers to his or her prior chosen repayment plan without any cost or delay to him or her, and by employing a REPAYE process that lasts more than one month.

233.    Some of Defendant's false representations include, but are not limited to:

   a)    Providing false information about REPAYE's material terms, including failing to fully, clearly and accurately explain REPAYE's material terms, thereby coercing borrower's to switch to REPAYE when it is not in their best interest;

   b)    falsifying borrower's income-driven repayment applications; and

  c)  falsely claiming that it cannot return improperly switched REPAYE borrowers to their previous plan (IBR, ICR or PAYE) without any cost or delay to the borrower;

234. Defendant's misrepresentations were directed toward Plaintiff.

235. Defendant failed to exercise reasonable care or competence in obtaining or communicating the information.

236. Defendant failed to exercise reasonable care or competence in ascertaining the truth or falsity of its statements.

237. Defendant intended for student loan borrowers, including Plaintiff, to rely on their information provided by Defendant in determining which income-driven student loan repayment plan was best for the student loan borrowers, in being placed in the correct and best income-driven student loan repayment plan for the student loan borrowers, and in having their income-driven student loan repayment plans processed and carried out in an effective and efficient manner.

238. Defendant also intended for student loan borrowers, including Plaintiff, to rely on its documents, correspondence, loan billing statements, emails and website as correct, even though the website contained vague, inaccurate, and misleading information and other documents were often incorrect.

239. As such, Defendant intended for student loan borrowers to rely on Defendant's incorrect information and, therefore, create, or cause a likelihood of, confusion or of misunderstanding about the best income-driven student loan

repayment plans for the student loan borrowers, how they could be treated after requesting to return to their previous plan, and how their income-driven student loan repayment plans were to be processed and carried out.

240.    Defendant's misrepresentations occurred during the presentation of information involving services to collect income-driven student loan repayment plans, the processing of services to collect income-driven student loan repayment plans, and the carrying out of services to collect income-driven student loan repayment plans.

241.    Plaintiff justifiably relied on Defendant's misrepresentations and incurred damages due to (1) the misleading, vague, and inaccurate information displayed by Defendant about the different income-driven student loan repayment plans, (2) being coerced or forced into an income-driven student loan repayment plan that was not the best for them, (3) being unable to return to their previously chosen income-driven student loan repayment plan without ramifications, and (4) Defendant's REPAYE processing procedures that last more than one month.

242.    Defendant, as Plaintiff's assigned student loan servicer, had a duty to accurately describe student loan repayment options, including providing students with correct information.

243.    Plaintiff's damages were directly and proximately caused by Defendant's unlawful conduct.

244.    Defendant's conduct was outrageous and done with a reckless indifference to the interests of others. Punitive damages are thus warranted, in order to deter Defendant and others from engaging in similar conduct in the future, as well as to provide additional compensation, retribution and an incentive to prevent injustices that might otherwise go unredressed.

## COUNT III – CONSTRUCTIVE FRAUD

245.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

246.    Defendant, as a student loan servicer, has a confidential and/or fiduciary relationship with Plaintiff and Constructive Fraud Class Members, as Defendant is privy to Plaintiff's and Class members' private, confidential information, including family size and arrangements, income information, and tax information, and Defendant represents to student loan borrowers, including Plaintiff and Class members, that Defendant is acting in the best interest of student loan borrowers, including providing student loan borrowers information and other tools to "help" or assist student loan borrowers in choosing the "right" or "best" repayment plan for themselves.

247.    Additionally, Defendant promotes that student loan borrowers chose an option that allow Defendant to place student loan borrowers in income-driven repayment plans.

248.    As such, Defendant acts in a position of advisor or counselor as reasonably to inspire confidence in student loan borrowers that they will act in good faith for the student loan borrower's interest.

249.    Further, the relative position of the Defendant and student loan borrowers, including Plaintiff, is such that Defendant has the power and means to take advantage of or exercise undue influence over the student loan borrowers.

250.    To increase its profits, rather than acting with scrupulous fairness and good faith in their dealings with student loan borrowers, and refraining from using their position to student loan borrower's detriment and their own advantage, Defendant made representations, performed certain conduct, and breached their confidential or fiduciary relationship that has allowed student loan holders to gain extra fees, interest, and payments from student loan borrowers and student loan servicers, like themselves, to gain monthly payments, interest subsidies and special allowance payments that they would not be entitled to if a borrower did not switch to REPAYE.

251.    Defendant accomplishes this breach of a confidential or fiduciary relationship by misrepresenting, concealing, or omitting REPAYE's material facts, coercing borrowers to switch to REPAYE or switching borrowers to REPAYE against their will, fraudulently representing that Defendant is unable to return those borrowers to their prior, chosen plan without any cost or delay to him or her, and by intentionally employing a REPAYE process that lasts more than one month.

252.    Some of Defendant's fraudulent conduct, misrepresentations and/or omissions include, but are not limited to:

a)    misrepresenting REPAYE's material terms, including failing to fully, clearly and accurately explain REPAYE's material terms, thereby coercing borrower's to switch to REPAYE when it is not in their best interest,

b)    falsifying borrower's income-driven repayment applications,

c)    switching borrower's to REPAYE against their will,

d)    refusing to return improperly switched REPAYE borrowers to their previous plan (IBR, ICR or PAYE) without any cost or delay to the borrower,

e)    intentionally causing their REPAYE process to last more than one month,

f)    charging extra fees the borrower would not have to pay if the borrower did not switch to REPAYE,

g)    charging extra standard, full payments the borrower would not have to pay if the borrower did not switch to REPAYE,

h)    charging extra capitalized interest Defendant would not be entitled to if the borrower did not switch to REPAYE,

i)    charging extra interest on that capitalized interest/capital Defendant would not be entitled to if the borrower did not switch to REPAYE,

j)    charging extra higher payments when the borrower has to pay their final months of REPAYE at a higher, time-adjusted wage because their required months were extended only because they switched to REPAYE.

253.    As such, Defendant is operating in a way most beneficial to themselves and, often, in a manner directly opposite of that requested by the student loan borrower,

such as Plaintiff and Class members, despite holding themselves out as acting in the best interest of the student loan borrower.

254. Defendant's fraudulent actions and fraudulent misrepresentations were directed toward Plaintiff.

255. Defendant intended for student loan borrowers, including Plaintiff, to rely on its actions and fraudulent misrepresentations in determining which income-driven student loan repayment plan was best for the student loan borrowers, in being placed in the correct and best income-driven student loan repayment plan for the student loan borrowers, and in having their income-driven student loan repayment plans processed and carried out in an effective and efficient manner.

256. Defendant also intended for student loan borrowers, including Plaintiff and Class members, to rely on their documents, correspondence, loan billing statements, emails and website as correct, even though the website contained vague, inaccurate, and misleading information and other documents were often incorrect.

257. As such, Defendant intended for student loan borrowers to rely on its actions and fraudulent misrepresentations and, therefore, create, or cause a likelihood of, confusion or of misunderstanding about the best income-driven student loan repayment plans for the student loan borrowers, how they could be treated after requesting to return to their previous plan, and how their income-driven student loan repayment plans were to be processed and carried out.

258. Defendant's actions and misrepresentations occurred during the presentation of information involving services to collect income-driven student loan repayment plans, the processing of services to collect income-driven student loan repayment plans, and the carrying out of services to collect income-driven student loan repayment plans.

259. Plaintiff, and upon information and belief, Class members relied on Defendant's confidential or fiduciary relationship and incurred damages due to (1) the misleading, vague, and inaccurate information displayed by Defendant about the different income-driven student loan repayment plans, (2) being coerced or forced into an income-driven student loan repayment plan that was not the best for them, (3) being unable to return to their previously chosen income-driven student loan repayment plan without ramifications, and (4) Defendant's REPAYE processing procedures that lasts more than one month.

260. Plaintiff's and Class members' damages were directly and proximately caused by Defendant's breach of a confidential or fiduciary relationship.

261. As such, Plaintiff and all others similarly situated have been damaged as a direct and proximate result of Defendant's willful, intentional, and outrageous conduct, warranting punitive damages for Defendant's irreprehensible behavior and injunctive relief to prevent Defendant from inaccurately describing REPAYE, continuing to coerce or force struggling student loan borrowers to switch to REPAYE, refusing to

return improperly switched REPAYE student loan borrowers to their previously chose repayment plan with no ramifications to the student loan borrowers, and having a REPAYE process that takes more than one month.

262.    Defendant's conduct was outrageous and done with a bad motive or with reckless indifference to the interests of others. Punitive damages are thus warranted, in order to deter Defendant and others from engaging in similar conduct in the future, as well as to provide additional compensation, retribution and an incentive to prevent injustices that might otherwise go unredressed.

## COUNT V – UNJUST ENRICHMENT

263.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

264.    Plaintiff and Unjust Enrichment Class members have conferred a benefit on Defendant in the form of extra, unnecessary payments of fees, interest, or other monies unearned and undeserved by Defendant.

265.    Defendant has been unjustly enriched at the expense of Plaintiff and all Unjust Enrichment Class and members.

266.    Defendant has been able to retain the benefits conferred by Plaintiff and Class members by maintaining its current unlawful practices, as set forth above, and be retaining payments of fees, interest or other monies that Defendant did not earn and does not deserve.

267.    Under the circumstances set forth above, Defendant retaining the benefit conferred on it by Plaintiff and Class members is unjust and inequitable.

268.    Because Defendant wrongfully obtained the benefit at the expense of Plaintiff and the Unjust Enrichment Class members through unlawful and inequitable conduct, Defendant is obligated to disgorge back to Plaintiffs and the members of the Unjust Enrichment Class all amounts by which Defendant has been unjustly enriched at the expense of Plaintiff and the Class Members.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of herself and all others similarly situated, request:

    A.  Entry of preliminary and permanent injunctions providing that Defendant shall be enjoined from:

        i.  Providing incomplete, vague or misleading information about REPAYE or any other income-driven student loan plan;

        ii.  Coercing student loan borrowers to switch to REPAYE;

        iii.  Forcing student loan borrowers to switch to REPAYE;

        iv.  Refusing to return student loan borrowers to their chosen plan without any ramifications after being notified that the student loan borrower had been placed in the incorrect plan; and

        v.  Utilizing a lengthy, inefficient, and ineffective income-driven student loan request processing system which takes more than one month for processing; and

    B.  Entry of judgment ordering Defendant to take affirmative steps to:

        i.  Provide student loan borrowers with complete, accurate information about REPAYE or any other income-driven student loan plan;

ii.  Return student loan borrowers to their chosen plan without any ramifications after being notified that the student loan borrower had been placed in an incorrect plan; and

iii. Create a one-month, effective, and efficient income-driven student loan request processing system; and

C.  Entry of judgment finding:

i.   Defendant violated the Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201;

ii.  Defendant is guilty of common law constructive fraud;

iii. Defendant is guilty of negligent misrepresentation; and

iv.  Defendant is guilty of unjust enrichment; and

D.  Monetary damages including compensatory, exemplary, and punitive damages to which Plaintiff and Class members are entitled and will be entitled at the time of trial, in an amount exceeding $5,000,000;

E.  Pre- and post-judgment interest;

F.  The costs of this action;

G.  Reasonable attorneys' fees; and

H.  Such other and further relief as the Court deems proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial on all issues so triable.

Respectfully submitted,

Dated: March 1, 2017

By: */s/ Marion Munley*
Marion Munley – Bar ID No. 46957
Munley Law PC
227 Penn Avenue

Scranton, PA 18503
Ph: 570-346-7401
Email: mmunley@munley.com

Brandon M. Wise (*pro hac vice* pending)
PEIFFER ROSCA WOLF
ABDULLAH CARR & KANE, APLC
818 Lafayette Ave., Floor 2
St. Louis, MO 63104
Ph: 314-833-4825
Email: bwise@prwlegal.com